CHIEF JUSTICE RABNER delivered the opinion of the Court.
**72 This disciplinary matter involves serious allegations that a private attorney engaged in unethical conduct and improperly influenced the prosecution of two individuals by the Cumberland County Prosecutor's Office. Certain aspects of the alleged behavior -- if proven -- would constitute conduct prejudicial to the administration of justice and violate Rule of Professional Conduct (RPC) 8.4(d).
Among other things, the Office of Attorney Ethics (OAE) asserts that the private attorney improperly influenced the criminal justice process when he helped draft the indictment, testified before the grand jury, and tried to manipulate the bail and arrest processes so that a high amount of bail would be posted and later paid as restitution to his client.
The prosecutor's office, of course, has a preeminent role in the enforcement of criminal laws. Prosecutors, not private counsel, have significant discretionary authority about whether to pursue criminal charges and how to proceed. As a result, we must examine not only whether the allegations are supported but also who bore responsibility for certain conduct in question.
In this case, because the record lacks clear and convincing evidence that respondent orchestrated the alleged misconduct, the OAE's complaint must be dismissed. That said, the record highlights a series of troublesome practices and leaves a number of questions unanswered. We briefly address some of those areas to offer guidance to private practitioners and prosecutors.
**73 I.
The decision of the Disciplinary Review Board (DRB) ably reviewed the facts at length. At its core, this disciplinary matter involved the following issues.
In 2008, respondent Yaron Helmer, an attorney in private practice who had previously served in the Cumberland County Prosecutor's Office (CCPO), was hired to represent National Freight, Inc. (NFI), a distribution company.
NFI was the victim of an alleged fraudulent scheme carried out by Trident, LLC, a bottled water company. Trident's corporate principals included James Land, Jr., its chief executive officer, and Michael Pessiki, its president.
In 2007, Trident and NFI executed a contract under which NFI agreed to deliver bottled water for Trident. Trident paid NFI more than $ 887,000 for distribution services but, in March 2008, a $ 100,000 check from Trident to NFI bounced. Afterward, the parties agreed that Trident would make daily payments of $ 17,000 for continued distribution services. NFI knew at the time that Trident was struggling financially. Under the new arrangement, most of Trident's daily checks cleared. In April 2008, four more checks, totaling $ 68,000, bounced. Collectively, the five bad checks that Trident passed totaled $ 168,000.
Trident went out of business in May 2008. Days later, NFI filed a civil lawsuit against Trident, Land, and Pessiki. The complaint, as amended, alleged that NFI
*1263 suffered $ 3 million in damages through breach of contract, unjust enrichment, fraud, and conspiracy to commit fraud. The suit claimed that Trident was a shell company created to protect the assets of another entity, and that Land and Pessiki had conspired to defraud Trident's creditors as the defendants tried to sell off other assets at a profit.
On May 16, 2008, NFI's vice president of security, who was not an attorney, warned Trident that NFI would pursue a criminal prosecution if Trident did not make NFI whole within twenty days. Several other creditors forced Trident into involuntary bankruptcy **74 on September 3, 2008. In both the civil lawsuit and the bankruptcy proceedings, NFI sought to pierce the corporate veil and pursue Land's and Pessiki's personal assets based on their allegedly fraudulent acts. Because the bankruptcy proceeding preempted the civil suit, the civil action was dismissed in May 2011. The bankruptcy was settled in July 2012, and NFI received $ 89,223.15 -- roughly 3.5 percent of its unsecured claim.
In June 2008, NFI's security manager, James Matlock, visited the Vineland Police Department and reported that Land and Pessiki had given NFI five checks that the bank returned for insufficient funds. Matlock also signed criminal complaints against Land and Pessiki. An assistant prosecutor at the CCPO reviewed the matter and declined to pursue criminal charges because the dispute "appear[ed] to be a civil matter between two companies."
NFI then retained Helmer to act as a "middleman" between the company and the Prosecutor's Office and persuade the office to prosecute Land and Pessiki for issuing bad checks. The retainer agreement, dated December 8, 2008, noted that NFI hired Helmer because of his "unique background and contacts in [Cumberland] County." Helmer worked in the CCPO from 1985 through 1989 and served as the First Assistant Prosecutor in 1988 and 1989.
Under the agreement, NFI promised to pay Helmer a one-time fee of $ 10,000 and a percentage of any restitution payments made: "20% of the first $ 500,000.00 ... plus 15% of any money in excess of $ 500,000.00 collected as restitution paid by the Defendant(s) in the criminal matter."
Helmer contacted Assistant Prosecutor David Branco about the matter in December 2008. At the time, Branco was chief of the major crimes and organized crime bureau for the CCPO. The two had previously worked together at the Prosecutor's Office and had become good friends.
The First Assistant at the time of Helmer's referral later testified at the disciplinary hearing. The First Assistant explained that, in response to concerns raised by law enforcement officers, **75 he had instructed Branco not to handle any of Helmer's cases "to avoid any appearance of impropriety" and to maintain the office's integrity. Branco described their conversation differently. He testified that the First Assistant only asked to be advised in advance of any plea colloquy in cases that Branco resolved with Helmer.
Branco discussed the NFI/Trident matter with Helmer, and Helmer urged Branco to pursue criminal charges. Branco assigned the case to G. Harrison Walters, a line prosecutor who had been with the office for three years and had little prior experience handling white collar cases.
On May 27, 2009, Branco met with Helmer, Matlock, and NFI's general counsel. Branco called Walters into the meeting while it was underway. Branco and Helmer ran and "dominated" the meeting, according to Walters.
The following plan was agreed on at the meeting: the CCPO would seek a sealed indictment against Land and Pessiki; arrest *1264 them in New Jersey by surprise; request high bail amounts; allege that the bail money represented the proceeds of a crime at a bail source inquiry; and arrange for the bail monies to be used as restitution for NFI. Under the plan, defendants would be required to post cash bail and would be offered Pre-Trial Intervention (PTI) if they agreed to pay restitution as a condition.
In essence, the plan was designed to obtain restitution for NFI through the arrests of Land and Pessiki. Had the plan worked, NFI, an unsecured creditor in the bankruptcy proceeding, might have received payment for its business losses outside of the bankruptcy process.
Walters conducted no independent investigation of NFI's allegations against Trident. The following events took place instead. Two weeks after the group meeting, Helmer sent Walters an email dated June 11, 2009. Helmer suggested that the CCPO seek an indictment on June 17, 2009, before the current, seasoned grand jury expired. In the email, Helmer outlined a brief narrative summary for the grand jury presentation and noted that he would **76 provide more details to the grand jury "in accordance with our previous conversation." Helmer also sketched out ten criminal charges for an indictment. Walters, in turn, directed his secretary to draft a ten-count indictment that followed Helmer's outline.
Walters presented the case to the grand jury on June 17, 2009 with Helmer as the sole witness. Walters testified that he would have preferred to call Matlock, a former State Trooper and, by then, a former NFI employee. Matlock also testified and said that he would have been available as a witness had he been called. Walters checked with Branco who said that if Helmer wanted to testify, he could.
Helmer appeared before the grand jury and claimed he testified as a victim advocate/navigator. He had previously spoken with certain employees at NFI and reviewed information they supplied, but he did not conduct an independent investigation.
The grand jury indicted Trident, Land, and Pessiki on all ten proposed counts, including second-degree charges of conspiracy, theft by deception, theft of services, and issuing bad checks. The following day, a Superior Court Judge signed arrest warrants against Land and Pessiki, which listed bail at "$ 150,000 Full Cash."
Neither Land nor Pessiki had a criminal record or any history of flight. Branco testified that, at the time of the indictment, the standard amount of bail for the crimes charged ranged from $ 35,000 to $ 75,000, with an option to post ten percent. He admitted that the higher bail was sought, among other reasons, "to get as close to the restitution amount as possible .... [Y]ou have at least $ 168,000 of bad checks."[1]
**77 At various times afterward, Walters, Branco, and Helmer discussed the arrest plan. Land and Pessiki, who lived outside New Jersey, would be arrested in Gloucester County on August 6, 2009, at a mediation session in the civil lawsuit. They would then be lodged in the Cumberland County Jail.
The plan fell apart when CCPO detectives refused to carry out the arrests, and the Chief of Detectives discussed the matter with the First Assistant. The First Assistant directed Walters to apply to reduce *1265 Land's and Pessiki's bail and have them released on their own recognizance (ROR). Soon after, a Superior Court Judge cancelled the arrest warrants and directed that Land and Pessiki be released ROR.
Land and Pessiki were arraigned on September 15, 2009. Walters represented that the CCPO would support PTI -- despite multiple second-degree charges -- if Land and Pessiki agreed to make full restitution to NFI. As Walters later testified, "that was ... part of the plan. It was trying to get the swift resolution, trying to get it done." After the arraignment, Helmer, on behalf of NFI, requested that the CCPO seek restitution well beyond the value of the bad checks. He claimed that NFI had incurred losses and expenses amounting to more than $ 1.8 million because of Trident's conduct.
Defense counsel moved to dismiss the indictment in December 2009 because of Helmer's allegedly improper involvement in the grand jury process. The trial court declined to dismiss at the time and noted, "I don't see any case law that says ... how it happened was inappropriate."
In August 2010, the trial court dismissed the indictment with prejudice because of the CCPO's failure to produce the original bounced checks. The CCPO disagreed with the court's evidentiary ruling but did not appeal. In letters to NFI and defense counsel, the CCPO explained that, "without equivocation or hesitation," it "agrees, as a matter of professional responsibility, that the manner of presentation to the Grand Jury was not proper and shall not be sanctioned or condoned." As to the merits, the Prosecutor's **78 Office added, "Our best professional judgment is that there does not exist a good faith basis to prove a criminal case beyond a reasonable doubt."
After an internal ethics investigation, the CCPO fired Branco and suspended Walters for six weeks without pay. The CCPO also referred Helmer and Branco to the Office of the Attorney General, which declined to prosecute. In addition, the CCPO made a referral to the OAE about Helmer, Branco, and Walters.
II.
A.
The OAE filed a disciplinary complaint against Helmer on March 20, 2015. The detailed Complaint asserts that Helmer's conduct violated three rules of professional conduct: RPCs 3.4(g), 8.4(a), and 8.4(d).
RPC 3.4(g) provides that "[a] lawyer shall not present, participate in presenting, or threaten to present criminal charges to obtain an improper advantage in a civil matter." The Complaint asserts multiple grounds for the charged violation including Helmer's entering into a retainer arrangement in which his fee was partly contingent upon payment of restitution; his meeting with Branco, Walters, Matlock, and NFI's general counsel to press for a criminal prosecution after a declination; Helmer's participation in drafting the indictment; his testimony before the grand jury; and his influencing Branco and Walters to seek high bail, have the indictment sealed, and arrest Land and Pessiki during a civil mediation session.
RPC 8.4(a) provides that "[i]t is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct." RPC 8.4(d) states that "[i]t is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice." The Complaint asserts that Helmer's "actions to collect money utilizing the criminal process on behalf of **79 NFI ... would have impacted the administration of justice in the criminal, civil and bankruptcy cases."
A special master conducted extensive hearings at which Helmer, Branco, Walters, Matlock, the First Assistant of the *1266 CCPO, NFI's general counsel, Land, multiple retired prosecutors, and others testified. After twelve days of testimony and the introduction of more than 150 documents, the special master concluded that the OAE failed to prove by clear and convincing evidence that Helmer violated the RPCs charged.
As to RPC 3.4(g), the special master concluded there was nothing wrong with Helmer's attempt to obtain restitution for his client in a criminal case while civil proceedings were ongoing. The special master relied on two sources for support: (1) the Crime Victim's Bill of Rights, which protects the rights of crime victims "[t]o be informed about available remedies" and "[t]o be compensated for their loss whenever possible," see N.J.S.A. 52:4B-36(h), (i) (2009) ; and (2) N.J.S.A. 2C:44-2(f), which provides that an order of restitution in a criminal matter "shall not operate as a bar to the seeking of civil recovery by the victim based on the incident underlying the criminal conviction." Taken together, the special master concluded, a crime victim may be represented by counsel and simultaneously seek "both criminal restitution and civil recovery for the same loss."
More pointedly, the special master found that the OAE did not demonstrate how Helmer's conduct could have given rise to an improper advantage in a civil matter. The special master observed that the CCPO, not Helmer, indicted Land and Pessiki; that Helmer could not control the arrest or the setting of bail; and that no advantage could have been gained in the bankruptcy proceeding in any event.
The special master viewed the charge under RPC 8.4(a) as "derivative of the RPC 3.4(g) charge." The special master likewise concluded that the alleged violation of RPC 8.4(d) rested heavily upon the RPC 3.4(g) charge. A finding of conduct prejudicial to the administration of justice, he noted, "entirely discounts the **80 independent conduct of at least two prosecutors" and "the involvement of several judges," whom Helmer did not control.
B.
A majority of the DRB agreed with the special master's dismissal of the RPC 3.4(g) charge but found that Helmer violated RPCs 8.4(a) and (d). The majority opinion concluded that Helmer
leveraged his forty years of experience in the criminal justice system, and his special access to members of the CCPO, couched in the retainer agreement as his "unique background and contacts in [Cumberland] County," to manipulate the criminal justice system on behalf of NFI. Using the Crime Victim's Bill of Rights as a sword and a shield, and believing his actions would, thus, be beyond reproach, respondent orchestrated an improper scheme to obtain NFI's desired monetary damages. He did so with the complicity of Branco and Walters, whom we do not view as "independent prosecutors."
Although the DRB agreed with the dismissal of the RPC 3.4(g) charge, the majority did not adopt the special master's legal conclusions. In particular, the majority explained that a violation of RPC 3.4(g) requires proof of intent to gain an improper advantage in a civil matter -- which the majority found lacking.
The DRB, however, did identify "several ethics 'red lights' " that Helmer "ran ... in his representation of NFI": pursuit of a criminal prosecution based on the same alleged misconduct in the civil and bankruptcy proceedings, which should have prompted ethics concerns; use of special access to the CCPO; manipulation of an inexperienced assistant prosecutor; design of a plan to charge and arrest individuals in order to convert a high bail into restitution;
*1267 and "highly irregular" and "irresponsible" testimony before the grand jury.
The majority concluded that Helmer "improperly orchestrated the prosecution of Land and Pessiki ... to secure as much monetary compensation as possible for NFI, which was at the back of the line in the bankruptcy proceedings." The DRB majority found that Helmer's "manipulation of the system was clearly prejudicial to the administration of justice" and violated RPC 8.4(d). Helmer's knowing recruitment of Branco and Walters into **81 the scheme also violated RPC 8.4(a), in that the majority found that Helmer induced them to violate RPC 8.4(d)"through the implementation of the plan."
A majority of the DRB voted to censure Helmer. Three members would have found a violation of RPC 3.4(g) as well. Two members voted to dismiss all of the charges and filed a dissent.
The dissent took issue with the OAE's use of "colorful language" to support a "generalized conclusion of impropriety." It found nothing improper about NFI's desire to pursue restitution and Helmer's zealous advocacy. The dissent also reviewed each of the ethics "red lights" discussed by the majority and observed they "are not themselves supported by any specific Rule of Professional Conduct." In the dissent's view, the points were "substantively without merit and unsupported by clear and convincing evidence."
Among other issues, the dissent noted the following: that Helmer did not seek to go around the bankruptcy proceeding because any restitution paid by Land or Pessiki would come from personal funds; that no ethical principle bars a private attorney from contacting a former colleague many years after they served together; that seasoned attorneys routinely interact with less experienced assistant prosecutors and may benefit from their greater expertise; that Helmer's advocacy for his client in meetings with prosecutors was not improper; that hearsay testimony before the grand jury by a victim advocate is not improper; and that the decision to seek high bail "was a decision of the CCPO," and the decision to fix bail was the court's. The dissent also noted that no ethics rule prohibited Helmer's contingent fee.
In conclusion, the dissent did not find clear and convincing evidence of a violation of RPC 8.4(a) or (d). For RPCs that lack precise guidelines -- like a proscription against conduct "prejudicial to the administration of justice" -- the dissent recommended that "particular care should be taken" to determine a violation.
We granted Helmer's petition for review. 236 N.J.390, 200 A.3d 375 (2018).
**82 III.
Helmer raises various challenges to the proceedings. He first levels a number of constitutional charges and argues that RPCs 3.4(g), 8.4(a), and 8.4(d) are void for vagueness, that they have been applied arbitrarily in a way that results in selective enforcement against him, and that their application violates protections guaranteed victims under Article I, Paragraph 22 of the State Constitution. Helmer also asserts that the DRB failed to give appropriate deference to the special master's findings, relied on testimony that was not credible, and found that he violated a section of RPC 8.4(a) not charged in the Complaint. In addition, Helmer contends that individual acts that do not violate the ethics rules cannot cumulatively violate them. Throughout the proceedings, Helmer has maintained that no discipline is warranted.
The OAE counters each of the above arguments. It argues that the RPCs, both as written and as applied, raise no constitutional concerns. It observes that the special master made no credibility determinations. It also contends that the DRB
*1268 appropriately considered Helmer's conduct as a whole in finding that he violated RPC 8.4(d). The OAE submits that Helmer should be censured, consistent with the DRB's recommendation.
As noted earlier, the DRB did not find clear and convincing evidence that Helmer violated RPC 3.4(g). The OAE did not file a cross-petition to challenge that conclusion. Instead, in a footnote, the OAE "reserve[d] the right to address the factual sufficiency of the RPC 3.4(g) charge at oral argument." Although the Court has the authority, on its own motion, "to review any determination" by the DRB when disbarment has not been recommended, see R. 1:20-16(b), we decline to consider the RPC 3.4(g) allegation separately here. The relevant facts and theories are sufficiently intertwined with the alleged violation of RPC 8.4(d), to which we now turn.
IV.
Pursuant to RPC 8.4(d), "[i]t is professional misconduct for a lawyer to engage in conduct that is prejudicial to the **83 administration of justice." As this Court has explained, the broad language of the rule "takes on sufficient definition to pass constitutional muster" when its scope is narrowed "to particularly egregious conduct." In re Hinds, 90 N.J. 604, 632, 449 A.2d 483 (1982). When the rule is "the sole basis for discipline," it applies only to conduct that "flagrantly violat[es] ... accepted professional norms." Ibid.
There are multiple strands to the charge that Helmer violated RPC 8.4(d). We address them in turn.
A.
At the center of this matter are questions about efforts to obtain restitution for NFI. No one disputes that a victim of an offense can seek restitution through the court system. The rights of victims in this and other areas are guaranteed by the State Constitution and statutory law. See State v. Tedesco, 214 N.J. 177, 195-96, 69 A.3d 103 (2013) (reviewing protections for crime victims under the Victim's Rights Amendment, N.J. Const. art. I, ¶ 22, and the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38).
Victims can pursue restitution in both the civil and criminal arenas. N.J.S.A. 2C:44-2(b) expressly empowers judges to sentence defendants to pay restitution. Section (f) of that statute acknowledges that defendants can also seek to be made whole through the civil process. N.J.S.A. 2C:44-2(f) (noting that an order of restitution in a criminal matter "shall not operate as a bar to the seeking of civil recovery by the victim," but the amount due shall be reduced to avoid double recovery); see also State v. DeAngelis, 329 N.J. Super. 178, 186, 747 A.2d 289 (App. Div. 2000).
One challenge practitioners face is to refrain from presenting or threatening "to present criminal charges to obtain an improper advantage in a civil matter." RPC 3.4(g). Heightened care is needed to navigate potential pitfalls in that area.
In this case, though, the core issue is not whether private counsel could pursue restitution through the criminal process but **84 rather the manner in which he sought to do so. To be clear, it would be unacceptable -- and prejudicial to the administration of justice -- for a private attorney to manipulate the criminal process by drafting charges, causing prosecutors to present them, and causing an inappropriately high bail to be set to serve as restitution for the attorney's client. In the unlikely event that might happen, it would amount to a perversion of the justice system.
Helmer's conduct here pushed the envelope, but we cannot conclude from the record that he orchestrated or induced such a scheme. Although he actively encouraged a criminal prosecution and advocated for *1269 restitution for his client, to place primary responsibility on Helmer for what occurred overlooks the role and decision-making authority of the prosecution team.
B.
The OAE faults Helmer at the outset for using special access to the Cumberland County Prosecutor's Office to ask it to reconsider its initial decision to decline prosecution.
Helmer left the CCPO in 1989 after having served there as the first assistant prosecutor. RPC 1.11(a)(3) bars a former government attorney from representing a client whose interests are materially adverse to the former government office. That limit extends for six months after the attorney leaves government service. Ibid. After that time, unless the lawyer "participated personally and substantially" in the matter or "had substantial responsibility" over the matter as a public officer, it is not inappropriate for an attorney in private practice to make a presentation to his or her former office on behalf of a client. RPC 1.11(a)(1)-(2) ; see also Kevin H. Michels, New Jersey Attorney Ethics: The Law of New Jersey Lawyering 569-71 (2019).
The hearing also explored Helmer's relationship with Branco, the chief of the major crimes and organized crime bureau for the CCPO. Helmer first approached Branco about the case, and the two discussed it on multiple occasions.
**85 The two had previously been colleagues at the CCPO and had become good friends. The Attorney General and county prosecutors can and do impose internal codes of ethics to govern such situations. The ABA, for example, provides aspirational guidance for prosecutors in this area: "A prosecutor who has a significant personal ... relationship with another lawyer should not participate in the prosecution of a person who is represented by the other lawyer, unless the relationship is disclosed to the prosecutor's supervisor and supervisory approval is given ...." ABA Criminal Justice Standards for the Prosecution Function § 3-1.7(h) (4th ed. 2015).
The record is not fully developed on this point. The First Assistant at the time testified that he had instructed Branco not to handle any of Helmer's cases "to avoid any appearance of impropriety" and maintain the office's integrity. Branco testified he had only been asked to give advance notice of plea colloquies in cases he resolved with Helmer. The special master made no findings on the issue. In any event, there is no evidence in the record that Helmer knew Branco had been told to recuse himself from Helmer's cases.
Half measures in this area can invite second-guessing and possible ethical challenges. When a prosecutor is recused from a private attorney's cases because of a significant personal, financial, professional, business, political, or other relationship, see ibid., the prosecutor should not participate in any aspect of a matter the attorney is handling. Likewise, if defense counsel knows that a particular prosecutor is recused from a matter, counsel should not approach the prosecutor to discuss the case in an official capacity.
C.
Much of the hearing focused on Helmer's role in the charging decision, grand jury process, and the question of bail. The OAE asserts that Helmer crafted the plan to charge and arrest two businessmen and arrange for them to be required to post high **86 bails for use as restitution. The record does not contain clear and convincing evidence to support that claim.
The principal plan took shape at a meeting on May 27, 2009 attended by Branco, *1270 Helmer, Matlock, NFI's general counsel, and Walters -- who arrived while the meeting was underway. Walters testified that Branco and Helmer "dominated" the meeting. Neither Walters, Branco, nor any other witness testified that Helmer orchestrated the scheme. Helmer claims he simply advocated for his client.
The ultimate decisions rested with the prosecutors. Only they could authorize a grand jury presentation. Only they could petition the trial court for an arrest warrant and make a recommendation for bail. And only a judge could sign the warrant and set bail. Those discretionary decisions, to be made in good faith, are not the responsibility of private counsel.
It is not at all inappropriate for private counsel to make a presentation to the prosecutor's office on behalf of a victim. The prosecutor represents the public and should independently assess the allegations presented. If, in the prosecution's judgment, further action is warranted, prosecutors and law enforcement officers ordinarily conduct an independent investigation. At a minimum, prosecutors have an obligation to review evidence with care and ensure early on that it satisfies the threshold requirement of probable cause. In doing so, they may rely on summary investigative reports prepared by trained officers and investigators.
In this case, however, a line prosecutor with little experience handling white collar cases conducted no follow-up investigation. He did not subpoena any documents or interview any witnesses. It appears that he proceeded to the grand jury based on the representations of a private attorney. The CCPO later disavowed what took place for good reason.
The OAE asserts that Helmer drafted the indictment. It would certainly be inappropriate for an assistant prosecutor to outsource the drafting of an indictment to a private attorney who represented **87 a client with an interest in the outcome. The record instead reveals that Helmer made detailed recommendations in writing about what he thought the indictment should allege. The line prosecutor relied heavily on those suggestions to structure and draft the indictment. He relayed them to his secretary, who prepared the proposed charging document. We cannot conclude from the record that Helmer improperly induced the line prosecutor to act.
Hearsay testimony is permitted before the grand jury. See State v. Ingram, 230 N.J. 190, 207, 165 A.3d 797 (2017) ; see also Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). In white collar cases, prosecutors routinely call investigators who are familiar with the facts to testify. Of course, witnesses with firsthand knowledge can also be summoned.
It is highly unusual for a victim's attorney -- who lacks firsthand knowledge and, in this case, stood to gain if restitution was obtained through the criminal process -- to appear as the sole witness before a grand jury. But the prosecutor, not private counsel, ultimately made the unorthodox decision to proceed in that way here. NFI's investigator, a former State Trooper, testified that he would have been available, yet no one asked him. Helmer, who offered to testify, appeared instead. The line prosecutor stated that he checked with his supervisor who said that if Helmer wanted to testify, he could.
To ensure that accurate and reliable information is presented to the grand jury, when witnesses with firsthand knowledge do not testify, the better practice is to call witnesses who have participated in an investigation or reviewed its results with care.
The record also raises a question about grand jury secrecy. Proceedings before the grand jury are conducted in secret. R. 3:6-7.
*1271 In a departure from that principle, the line prosecutor admitted that he discussed the grand jury's vote with his supervisor and Helmer soon after the return of an indictment and after it had been sealed. Helmer disputes that account in his brief and states **88 "[t]here was no post-presentation meeting." If such a discussion took place, it would have been improper.
Finally, on the issue of bail, it is striking that the prosecution originally -- and in a manner not supported by Rule 3:26-1(a) (2009) -- recommended high bail amounts in part "to get as close to the restitution amount as possible." The $ 150,000 full cash bail originally set in this matter also far exceeded the guidelines in place at the time. Supplement to Administrative Directive # 9-05 (May 12, 2009). Once again, even if Helmer argued to the prosecutors that bail be set at an inappropriately high amount, for an inappropriate reason, the prosecution made that recommendation to the court, and the court ultimately accepted it. We cannot find that Helmer induced the prosecutors and the court to act.
Woven into a number of the above allegations is the claim that Helmer, a former prosecutor and seasoned defense attorney, manipulated an inexperienced line prosecutor. In our system, practiced defense attorneys routinely interact with less experienced prosecutors, just as veteran prosecutors often work opposite less experienced counterparts. Both sides, of course, can seek guidance from colleagues, fellow counsel, or supervisors. The advantage that comes with experience does not implicate ethical questions as long as counsel on both sides abide by the canons of professional responsibility.[2]
V.
The burden of proof in disciplinary matters is clear and convincing evidence. R. 2:15-15(a). That standard calls for evidence that
" 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established,' evidence 'so clear, direct and **89 weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the precise facts in issue.' "
[ In re Seaman, 133 N.J. 67, 74, 627 A.2d 106 (1993) (quoting In re Boardwalk Regency Casino License Application, 180 N.J. Super. 324, 339, 434 A.2d 1111 (App. Div. 1981) (alterations in original) ).]
In addition, as noted above, when a violation of RPC 8.4(d) is the sole basis for discipline, a particularly high level of proof is required -- evidence of a flagrant violation of accepted professional norms. Hinds, 90 N.J. at 632, 449 A.2d 483.
The proceedings in this matter did not follow best practices and were troubling in a number of respects. Nonetheless, we do not find clear and convincing evidence that Helmer's conduct met the high threshold described above and violated RPC 8.4(d). As a result, we need not address Helmer's constitutional challenges and other claims.
For the reasons set forth above, we dismiss the disciplinary charges.
ORDER
It is ORDERED that the formal complaint filed in District Docket No. XIV-2012-0606E against Yaron Helmer of Haddon Heights , who was admitted to the bar of this State in 1978, is hereby dismissed *1272 for lack of clear and convincing evidence of unethical conduct.
JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in CHIEF JUSTICE RABNER's opinion. JUSTICE SOLOMON did not participate.

Under the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26, it is extremely unlikely that a high bail would be set in a case like this today. Even at the time of the indictment, though, restitution was not a factor to consider in determining the appropriate amount of bail. See R. 3:26-1(a) (2009) (listing factors).

In discussing the conduct of the prosecutors who handled this matter, we make no specific findings against them. We recognize that they were not the subject of ethics charges and testified in the context of proceedings directed only against Helmer.