SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**In the Matter of John J. Robertelli (D-126-19) (084373)**

**February 1, 2021 -- Decided September 21, 2021**

**ALBIN, J., writing for a unanimous Court.**

The issue in this attorney disciplinary case is whether Respondent John Robertelli violated Rule of Professional Conduct (RPC) 4.2, which prohibits a lawyer from communicating with another lawyer's client about the subject of the representation without the other lawyer's consent. That ethical prohibition applies to any form of communication with a represented party by the adversary lawyer or that lawyer's surrogate, whether in person, by telephone or email, or through social media. The Office of Attorney Ethics (OAE) brought disciplinary charges against Robertelli, asserting that he violated RPC 4.2 when his paralegal sent a Facebook message to, and was granted "friend" status by, Dennis Hernandez, who had filed an action against Robertelli's client. The charged violation occurred more than a decade ago, when the workings of a newly established social media platform -- Facebook.com -- were not widely known.

In November 2007, Robertelli represented the Borough of Oakland and an Oakland police sergeant in a personal-injury lawsuit filed by Hernandez. In preparing a defense, Robertelli requested that Valentina Cordoba, a paralegal, conduct internet research into Hernandez's academic and employment background, and any criminal history. As part of that research, Cordoba gained access to Hernandez's private Facebook page when Hernandez designated her as a "friend." At that time, Hernandez did not know that Cordoba was working for the law firm representing the parties he was suing.

Cordoba downloaded postings from Hernandez's Facebook page that included a video showing Hernandez wrestling. The defense believed that the wrestling episode may have occurred after Hernandez's accident. Robertelli forwarded to Hernandez's attorney, Michael Epstein, the Facebook postings downloaded by Cordoba. In a letter to Robertelli, Epstein accused him of violating RPC 4.2.

In May 2010, Hernandez filed a grievance with the District Ethics Committee. The Secretary of the Committee, with the concurrence of a non-lawyer public member, concluded that Hernandez's "grievance, even if proven, would not constitute unethical conduct," and therefore declined to docket the grievance for full review.

In July 2010, Epstein wrote to ask the OAE Director to investigate the "unethical conduct" of Robertelli. The OAE conducted an investigation and filed a complaint against Robertelli alleging that he violated several RPCs. At an April 2018 hearing before a Special Master, the testimony highlighted that Facebook in 2008 was unknown terrain to many attorneys.

Cordoba testified that she had a Facebook page, which did not identify her as a paralegal at Robertelli's firm. She monitored Hernandez's Facebook page, which at first was open to the public, and she reported to Robertelli about the public postings. But Hernandez's Facebook page later turned private, and she told Robertelli she no longer had access without sending a "friend" request. Cordoba claimed that Robertelli eventually gave her the green light to send Hernandez "a general message" and to proceed to monitor Hernandez's Facebook page. She believed, however, that despite her efforts to explain Facebook to Robertelli, he did not grasp the significance of a "friend" request. Cordoba, via Facebook, then forwarded Hernandez a message stating that he looked like one of her favorite hockey players, and Hernandez sent her a "friend" request.

Hernandez testified that his Facebook page was private -- and never public -- during the lawsuit and that Cordoba sent him a "friend" request, which he accepted. Because Hernandez deleted his Facebook page during the lawsuit and before he filed his ethics grievance, his Facebook records were not produced at the hearing to credit either Cordoba's or Hernandez's version of events.

Robertelli testified that in 2008 he had been practicing law for approximately eighteen years and did not know much about Facebook. He did not know that a Facebook page had different privacy settings or what it meant to be a Facebook "friend." He believed that the information posted on the internet, including Facebook, was "for the world to see." He denied directing Cordoba to "friend" Hernandez or to contact or send a message to him. He recalled advising Cordoba to monitor whether Hernandez was placing information about the lawsuit on the internet. He said he had no understanding that Cordoba was communicating directly or indirectly with Hernandez.

The Special Master concluded that the OAE failed to prove by clear and convincing evidence that Robertelli violated the RPCs. The Special Master determined that Robertelli, "an attorney with an unblemished record and a reputation for integrity and professionalism," reasonably believed that his paralegal was merely exploring "publicly available information for material useful to his client" while his young paralegal, experienced in social networking, "was unaware of potentially applicable ethical strictures." In concluding that Robertelli "proceeded at all times in good faith," the Special Master dismissed in their entirety the charges in the disciplinary complaint.

Following a de novo review of the record, six members of the Disciplinary Review Board (DRB) determined that Robertelli violated the RPCs.

2

**HELD:**    *After conducting a de novo review of the record and affording deference to the credibility findings of the Special Master, the Court concludes that the OAE has failed to establish by clear and convincing evidence that Robertelli violated the RPCs. The disciplinary charges must therefore be dismissed.

*Attorneys should know that they may not communicate with a represented party about the subject of the representation -- through social media or in any other manner -- either directly or indirectly without the consent of the party's lawyer. Today, social media is ubiquitous, a common form of communication among members of the public. Attorneys must acquaint themselves with the nature of social media to guide themselves and their non-lawyer staff and agents in the permissible uses of online research. At this point, attorneys cannot take refuge in the defense of ignorance. The Court refers this issue and any related issues to the Advisory Committee on Professional Ethics for further study and for consideration of amendments to the RPCs.

1. As of early 2008, Robertelli did not know how Facebook functioned, did not know about its privacy settings, and did not know the language of Facebook, such as "friending." And no jurisdiction had issued a reported ethics opinion giving guidance on the issue before the Court -- whether sending a "friend" request to a represented client without the consent of the client's attorney constitutes a communication on the subject of the representation in violation of RPC 4.2. The absence of ethical guidance at that time evidently reflected that Facebook had yet to become the familiar social media platform that it is today in the legal community. Further, the Court gives due regard to the Special Master's credibility findings based on his careful observation of the witness testimony unfolding before his eyes. In the end, based on an independent review of the record, the Court finds that the OAE has not met its burden of proving the disciplinary charges against Robertelli by clear and convincing evidence. (pp. 26-32)

2. Robertelli may have had a good faith misunderstanding about the nature of Facebook in 2008, but there should be no lack of clarity today about the professional strictures guiding attorneys in the use of Facebook and other similar social media platforms. When represented Facebook users fix their privacy settings to restrict information to "friends," lawyers cannot attempt to communicate with them to gain access to that information, without the consent of the user's counsel. Both sending a "friend" request and enticing or cajoling the represented client to send one are prohibited forms of conduct under RPC 4.2, as other jurisdictions have determined under their own rules of court. (pp. 32-35)

3. Lawyers should now know where the ethical lines are drawn. Lawyers must educate themselves about commonly used forms of social media to avoid the scenario that arose in this case. The defense of ignorance will not be a safe haven. And the Court reminds the bar that attorneys are responsible for the conduct of the non-lawyers in their employ or under their direct supervision. Under RPC 5.3, attorneys must make reasonable efforts to ensure that their surrogates -- including investigators or paralegals -- do not

3

communicate with a represented client, without the consent of the client's attorney, to gain access to a private Facebook page or private information on a similar social media platform.  (pp. 35-36)

4.  The Court refers to the Advisory Committee on Professional Ethics, for further consideration, the issues raised in this opinion.  After its review, the Committee shall advise the Court whether it recommends any additional social media guidelines or amendments to the RPCs consistent with this opinion.  (p. 36)

**The disciplinary charges against Respondent are DISMISSED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.**

4

In the Matter of

John J. Robertelli,

an Attorney at Law

On an order to show cause why respondent
should not be disbarred or otherwise disciplined.

| Argued | Decided |
|--------|---------|
| February 1, 2021 | September 21, 2021 |

Steven J. Zweig, Deputy Ethics Counsel, argued the
cause on behalf of the Office of Attorney Ethics (Steven
J. Zweig, on the briefs).

Michael S. Stein argued the cause on behalf of
respondent (Pashman Stein Walder Hayden, attorneys;
Michael S. Stein and Janie Byalik, on the briefs).

JUSTICE ALBIN delivered the opinion of the Court.

Our Rules of Professional Conduct (RPCs) generally prohibit a lawyer

from communicating with another lawyer's client about the subject of the

representation without the other lawyer's consent. RPC 4.2. That ethical

prohibition applies to any form of communication with a represented party by

the adversary lawyer or that lawyer's surrogate, whether in person, by

1

telephone or email, or through social media.  Although it is fair game for the adversary lawyer to gather information from the public realm, such as information that a party exposes to the public online, it is not ethical for the lawyer -- through a communication -- to coax, cajole, or charm an adverse represented party into revealing what that person has chosen to keep private.

The issue in this attorney disciplinary case is the application of that seemingly clear ethical rule to a time, more than a decade ago, when the workings of a newly established social media platform -- Facebook.com -- were not widely known.  In 2008, Facebook -- then in its infancy -- had recently expanded its online constituency from university and high school students to the general public.  A Facebook user could post information on a profile page open to the general public or, by adjusting the privacy settings, post information in a private domain accessible only to the universe of the user's "friends."

Respondent John Robertelli represented a public entity and public employee in a personal-injury action brought by Dennis Hernandez.  During the course of internet research, Robertelli's paralegal forwarded a flattering message to Hernandez, and Hernandez unwittingly granted her "friend" status, giving her access to his personal private information.

2

As a result, the Office of Attorney Ethics (OAE) brought disciplinary charges against attorney Robertelli for a violation of RPC 4.2 and other RPCs. The matter proceeded before a Special Master, who heard three days of testimony in 2018. Robertelli testified that he had little knowledge or understanding of Facebook at the time and never knowingly authorized his paralegal to communicate with Hernandez to secure information that was not publicly available. The Special Master found that the conflicting testimony between Robertelli and his paralegal about the exact nature of their conversations a decade earlier was the product of the natural dimming of memories due to the passage of time. The Special Master, in particular, found that Robertelli in 2008 did not have an understanding of Facebook's privacy settings or Facebook-speak, such as "friending." The Special Master held that the OAE did not prove by clear and convincing evidence that Robertelli violated the RPCs and dismissed the charges.

The Disciplinary Review Board split, with six members voting to sustain the charges against Robertelli (four in favor of an admonition and two in favor of a censure) and three members voting to dismiss the charges.

After conducting a de novo review of the record and affording deference to the credibility findings of the Special Master, we conclude that the OAE has

failed to establish by clear and convincing evidence that Robertelli violated the RPCs. The disciplinary charges must therefore be dismissed.

We add the following. Attorneys should know that they may not communicate with a represented party about the subject of the representation -- through social media or in any other manner -- either directly or indirectly without the consent of the party's lawyer. Today, social media is ubiquitous, a common form of communication among members of the public. Attorneys must acquaint themselves with the nature of social media to guide themselves and their non-lawyer staff and agents in the permissible uses of online research. At this point, attorneys cannot take refuge in the defense of ignorance. We refer this issue and any related issues to the Advisory Committee on Professional Ethics for further study and for consideration of amendments to our RPCs.

I.

A.

We rely on the record developed before the Special Master. We begin with the facts that are not in dispute.

In November 2007, Robertelli, a partner at the law firm of Rivkin Radler, LLP, represented the Borough of Oakland and an Oakland Police Department sergeant in a personal-injury lawsuit filed in Superior Court by

4

Dennis Hernandez. Hernandez claimed that while he was doing push-ups in the police station's parking lot, the sergeant's vehicle struck him, causing permanent physical injuries and the loss of an athletic scholarship.

In preparing a defense, Robertelli requested that Valentina Cordoba, a paralegal in the firm, conduct internet research into Hernandez's academic and employment background, and any criminal history. As part of that research, Cordoba gained access to Hernandez's private Facebook page when Hernandez designated her as a "friend." At that time, Hernandez did not know that Cordoba was working for the law firm representing the parties he was suing. Cordoba downloaded postings from Hernandez's Facebook page that included a video showing Hernandez wrestling with his brother. The defense believed that the wrestling episode may have occurred after Hernandez's accident.

With that information in hand, Gabriel Adamo, an associate at Rivkin Radler, deposed Hernandez. Afterwards, Robertelli forwarded to Hernandez's attorney, Michael Epstein, the Facebook postings downloaded by Cordoba. In a letter to Robertelli, Epstein accused him of violating RPC 4.2 by communicating with his client, through Facebook, without his consent about the subject of the representation. Hernandez would later testify that the wrestling video downloaded by Cordoba predated his accident and had been posted by a "friend."

5

The Superior Court judge assigned to the case barred the use of the Facebook postings because the information was disclosed after the end date for the completion of discovery but made no finding of an ethical violation, as urged by Epstein.

In May 2010, Hernandez filed a grievance with the District II-B Ethics Committee, alleging that Robertelli and Adamo violated the RPCs by having their paralegal directly contact him through Facebook without the consent of his counsel. The Secretary of the District Ethics Committee, with the concurrence of a non-lawyer public member, concluded that Hernandez's "grievance, even if proven, would not constitute unethical conduct," and therefore declined to docket the grievance for full review by the Committee. See R. 1:20-3(e)(3).

By letter, on July 30, 2010, Epstein asked the OAE Director to investigate the "unethical conduct" of both Robertelli and Adamo. Epstein claimed that, during a lawsuit and without his consent, the two attorneys "directly contacted" his client through their paralegal who -- without disclosing her position -- requested that the client "friend" her, allowing her to access his private Facebook page.

The OAE conducted an investigation and, in November 2011, filed a complaint against Robertelli and Adamo, alleging violations of RPC 4.2

6

(communicating with a person represented by counsel); RPC 5.1(b) and (c) (failure to supervise a subordinate lawyer -- charged only against Robertelli); RPC 5.3(a), (b), and (c) (failure to supervise a non-lawyer assistant); RPC 8.4(a) (violation of the RPCs by inducement or through the acts of another); RPC 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation); and RPC 8.4(d) (conduct prejudicial to the administration of justice).

In January 2012, Robertelli and Adamo answered the complaint, asserting that they acted in good faith and committed no unethical conduct. Robertelli admitted that he asked Cordoba "to perform a broad and general internet search regarding Hernandez" in defending the personal-injury action. But he explained that he did not "understand how Facebook worked" at the time and believed that "Cordoba was accessing information that was publicly available" by clicking "the 'friend' button." Robertelli apologized for any error committed through inadvertence and denied engaging in any knowing or purposeful misconduct.

Robertelli and Adamo then requested that the OAE withdraw its complaint in light of the District Ethics Committee's decision not to file charges. When the OAE refused to do so, Robertelli and Adamo filed an action in Superior Court seeking a declaration that the OAE Director lacked authority to review the District Ethics Committee's decision. See Robertelli v.

7

OAE, 224 N.J. 470, 475 (2016).  The trial court dismissed the action because the New Jersey Supreme Court has exclusive jurisdiction over attorney disciplinary matters, and the Appellate Division affirmed.  Id. at 476.

We held that, although the OAE Director does not have appellate authority to override a District Ethics Committee decision declining to docket a grievance, the Director does have the independent power, under our court rules, to investigate and bring disciplinary charges against an attorney -- and to prosecute those charges.  Id. at 486-91.  We added that "[w]e anticipate that the Director will use that power sparingly to address novel and serious allegations of unethical conduct."  Id. at 490.  We also noted that "[t]his matter presents a novel ethical issue" and that "[n]o reported case law in our State addresses the question."  Id. at 487.

### B.

In March 2017, this Court appointed Michael Kingman to serve as the Special Master in this case.  During three consecutive days in April 2018, the Special Master heard testimony about the circumstances surrounding Cordoba's gaining access to Hernandez's Facebook page, about Robertelli's knowledge of Facebook, and about his conversations with and supervision of Cordoba a decade earlier.  The passage of time challenged the memories of the

8

witnesses, and the Special Master attempted to make sense of the conflicting accounts.

A short primer on Facebook, its growth in the world of social media, and the public and private information made available by its users will be helpful in elucidating the issues before us.[1]

1.

Facebook is a social media platform on the internet that permits users to post and share information, including messages, articles, and other writings; photographs; and video recordings. Users can share information either with the general public or, by setting privacy restrictions, with a more limited audience, such as Facebook "friends." A Facebook "friend" is not a friend in the colloquial sense. Any person granted access to the more privately guarded information by the user is deemed a "friend" in the language of Facebook. A person becomes a Facebook "friend" either by sending the user a "friend" request that the user accepts by the click of a button, or by receiving a "friend" request from the user that the person accepts by the click of a button.

---

[1] "Social media" is defined as "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, personal messages, and other content (such as videos)." Social Media, Merriam-Webster, https://www. merriam-webster.com/dictionary/social%20media (last visited Aug. 4, 2021).

Information restricted to Facebook "friends" is not available to the general public.

Facebook was launched in 2004 to a limited scope of users -- college and university students and later high school students.[2] Not until the latter part of 2006 was Facebook membership opened to the general public.[3] In July 2007, Facebook had 30 million users worldwide;[4] in August 2008, 100 million users;[5] and as of June 2021, 2.9 billion users.[6]

In 2008, only fifteen percent of lawyers who responded to the American Bar Association's Legal Technology Survey reported personally maintaining a

---

[2] Alexis C. Madrigal, Before It Conquered the World, Facebook Conquered Harvard, The Atlantic (Feb. 4, 2019), https://www.theatlantic.com/technology/archive/2019/02/and-then-there-was-thefacebookcom/582004.

[3] Our History, Facebook, https://about.facebook.com/company-info (last visited Aug. 4, 2021).

[4] Sarah Phillips, A Brief History of Facebook, The Guardian (July 25, 2007), https://www.theguardian.com/technology/2007/jul/25/media.newmedia.

[5] Associated Press, Number of Active Users at Facebook over the Years, yahoo!news (May 1, 2013), https://news.yahoo.com/number-active-users-facebook-over-230449748.html.

[6] Press Release, Facebook, Facebook Reports Second Quarter 2021 Results (July 28, 2021), https://investor.fb.com/investor-news/press-release-details/2021/Facebook-Reports-Second-Quarter-2021-Results.

presence on social media.[7]  In contrast, by 2020, seventy-seven percent of lawyers reported using social media for professional purposes.[8]

The testimony at the hearing before the Special Master highlighted that Facebook in 2008 was unknown terrain to many attorneys.  In line with that assessment, Cordoba stated that "Facebook was in its infancy" in 2008, that Robertelli did not understand Facebook's "terminology" or the privacy settings for a Facebook page, and that his overall comprehension on the subject was "maybe a two" out of ten.

Robertelli testified that in 2008 he did not have a social media account and had a "[m]inimum" understanding of Facebook.  His associate, Gabriel Adamo, similarly stated that he did not know "what it meant to be a friend on Facebook" and thought Facebook was another venue for information generally available on the internet.  Even Hernandez's counsel, Michael Epstein, admitted that he was "relatively unfamiliar with Facebook at that time" and did not recall having a Facebook profile.

---

[7]  Reginald Davis, Getting Personal, A.B.A. J. (Aug. 2, 2009), https://www.abajournal.com/magazine/article/getting_personal.

[8]  Allison C. Shields Johs, 2020 Websites & Marketing, A.B.A. (Nov. 9, 2020), https://www.americanbar.org/groups/law_practice/publications/techreport/ 2020/webmarketing.

With that background in mind, we turn to the critical testimony in this disciplinary matter.

2.

Cordoba testified that while she did general internet research on the Hernandez personal-injury case for Robertelli in 2008, she had a Facebook page -- the same one she had before she graduated from college in 2004. The page did not identify her as a paralegal at Rivkin Radler. As a Facebook user, she monitored Hernandez's Facebook page, which at first was open to the public and then turned private. She reported to Robertelli about the public postings. But when Hernandez's Facebook page turned private, she told Robertelli she no longer had access without sending Hernandez a "friend" request. She recalled Robertelli telling her to hold off sending the request until he checked with the insurance adjuster. But she was uncertain whether Robertelli understood the mechanics of Facebook, the privacy settings for a Facebook page, or the meaning of a "friend" request. Cordoba claimed that, after Robertelli checked with the adjuster, he gave her the green light to send Hernandez "a general message" and to proceed to monitor Hernandez's Facebook page. She believed, however, despite her efforts to explain Facebook to Robertelli, he did not grasp the significance of a "friend" request.

Cordoba, via Facebook, then forwarded Hernandez a message stating that he looked like one of her favorite hockey players. Hernandez responded with some flirtatious messages -- to which Cordoba did not reply -- and sent her a "friend" request, which she accepted. Cordoba then gained access to Hernandez's private Facebook page as one of his six-hundred-plus "friends."

Hernandez gave a different account from Cordoba's. Hernandez testified that his Facebook page was private -- and never public -- during the lawsuit. Hernandez stated that Cordoba sent him a "friend" request, which he accepted. Afterwards, according to Hernandez, he messaged Cordoba, asking her who she was, and she replied that he looked like her favorite hockey player. Because Hernandez deleted his Facebook page during the lawsuit and before he filed his ethics grievance, his Facebook records were not produced at the hearing to credit either Cordoba's or Hernandez's version of events.

Robertelli testified that in 2008 he had been practicing law for approximately eighteen years and was the attorney responsible for the defense in the Hernandez case. According to Robertelli, at the time that he asked Cordoba to conduct internet research, he did not know much about Facebook. He did not know that a Facebook page had different privacy settings or what it meant to be a Facebook "friend." He believed that the information Hernandez posted, or others posted, on the internet, including Facebook, was "for the

13

world to see." He denied directing Cordoba to "friend" Hernandez or to contact or send a message to him. He recalled advising Cordoba to monitor whether Hernandez was placing information about the lawsuit on the internet. He also remembered that, during a brief conversation, Cordoba told him that Hernandez's Facebook "information is now in a different area that [she could] access by the click of a button." Cordoba described the website as "the equivalent of . . . posting something on a bulletin board"; she did not say that Hernandez's Facebook privacy settings were changed from public to private or that she had to send him a "friend" request. Robertelli admitted that he told Cordoba at first to wait until he spoke with Dawn Mulligan, head of claims and risk management of the Bergen County Municipal Joint Insurance Fund,[9] and then afterward to "[c]lick on the button and continue to monitor the site." But, he said, he had no understanding that Cordoba was communicating directly or indirectly with Hernandez.

Only after Robertelli released the information downloaded from Hernandez's Facebook page in discovery and Epstein charged him with violating the RPCs did Robertelli learn that Cordoba had directly contacted Hernandez. By then, Cordoba had joined another law firm in the same

---

[9] The Joint Insurance Fund retained Robertelli to represent the Borough of Oakland.

building as Rivkin Radler. In the building cafeteria, Robertelli encountered Cordoba, and the two conversed about the Hernandez case. At that point, for the first time, Cordoba told Robertelli that she had sent a message to Hernandez.

C.

After hearing three days of testimony and reviewing numerous exhibits, the Special Master issued a forty-eight-page report in which he concluded that the OAE failed to prove by clear and convincing evidence that Robertelli violated the RPCs as alleged in the complaint.[10] The Special Master made the following findings by clear and convincing evidence:

1. "[Robertelli] was ignorant as to the nature and extent of information available on the internet, and proceeded under the misimpression that" what Hernandez posted was available "for viewing by the world."

2. "[Robertelli] had no knowledge or understanding of social networking privacy settings or 'friend' requests."

3. Cordoba, a young paralegal, knowledgeable about Facebook from her days as a student, did not educate Robertelli about the new information-sharing

---

[10] The OAE dismissed the charges against Adamo, Robertelli's associate, at the conclusion of its case.

technology because -- through no fault of her own -- "she did not understand that to be part of her job."

4.  Cordoba engaged in what she viewed as normal research practice, accessed information, and reported the results to Robertelli.

5.  Robertelli viewed the material supplied by Cordoba as if it had been taken off a "bulletin board" on which it had been posted.

6.  Robertelli believed that "people sometimes published information about themselves on the internet for the world at large to see, and that looking at that information was part of the due diligence required in handling a lawsuit."

7.  Robertelli had "a few brief conversations" with Cordoba instructing her "to 'monitor' the Hernandez postings."

Given the novelty of Facebook, the Special Master also could <u>not</u> find by clear and convincing evidence that "[Robertelli] knew or should have known what . . . 'friending' meant," and concluded that the Facebook nomenclature "was in effect a foreign language to [Robertelli], as it would have been to most lawyers" at the time.

The Special Master made credibility findings as well.  He expressed "serious doubts about the accuracy of much of the testimony at the hearing, particularly that of Cordoba," primarily because of the passage of time.  He

16

noted that Cordoba's "uncertain recollection" needed to be refreshed at various times and concluded that "[h]er interpretation today of a few brief conversations with [Robertelli]" could "hardly be relied upon to meet" the clear-and-convincing-evidence standard.[11]  Indeed, he emphasized that no "definitive conclusions" could be reasonably drawn "from fragments of a conversation partially recalled from ten years earlier."

The Special Master observed that Robertelli's instruction to Cordoba to put on hold the research until he checked with the insurance adjuster logically suggested that Robertelli needed to secure the insurer's financial commitment to cover such work.  The Special Master also indicated that the failure of Hernandez's counsel -- the grievant -- to preserve his client's "Facebook settings and contents" hobbled the factfinding process.  For example, the information, if not deleted, would have revealed whether Hernandez's Facebook page, at first, was open to the public and whether Hernandez or Cordoba initiated the "friend" request.

In the end, the Special Master determined, by clear and convincing evidence, that Robertelli, "an attorney with an unblemished record and a

_____

[11]  The Special Master gave Cordoba her due, stating that "she tried to be [truthful]" in her testimony during which "she was afflicted with laryngitis and a severe cold."  We do not believe that the Special Master was suggesting that Cordoba was not credible because she was under the weather.

reputation for integrity and professionalism," reasonably believed that his paralegal was merely exploring "publicly available information for material useful to his client" while his young paralegal, experienced in social networking, "was unaware of potentially applicable ethical strictures." In concluding that Robertelli "proceeded at all times in good faith," the Special Master dismissed in their entirety the charges in the disciplinary complaint.

Last, the Special Master recommended that this Court adopt a rule "that attorneys may not directly or indirectly friend someone represented by counsel without the knowledge and consent of such counsel."

D.

Following a de novo review of the record, six members of the Disciplinary Review Board (DRB) determined that Robertelli violated three RPCs. They concluded that the "facts" supported the findings that (1) Robertelli directed Cordoba to "communicate[] with a party represented by counsel, about the litigation, in violation of RPC 4.2"; (2) Robertelli failed to make reasonable efforts to ensure that a nonlawyer under his supervision acted in accordance with his own professional obligations and additionally "'ratified' the misconduct by attempting to use the fruits of Cordoba's surveillance in the underlying litigation," in violation of RPC 5.3(a), (b), and (c); and (3) Cordoba's "misrepresentation by silence or omission" to gain

18

access to Hernandez's Facebook page is imputed to Robertelli, constituting a violation of RPC 8.4(c).[12]

Four of those six DRB members -- the plurality -- voted to impose an admonition, and the other two members, writing a separate opinion, voted to impose a censure. Three other DRB members, in two separate opinions, voted to dismiss all the disciplinary charges. The four opinions issued reflect the different story lines accepted by the DRB members.

## 1.

The plurality rejected what it viewed as the Special Master's finding that Cordoba was "less credible because she was sick during her testimony" or because she needed to have her memory refreshed with statements she made earlier. The plurality stated that "[t]his is the rare instance where we do not accept a credibility determination made by a trier of fact."

The plurality independently determined that "Cordoba's version" of her conversation with Robertelli concerning the Facebook research "is likely more credible than [his]." The plurality did not accept Robertelli's reasons for telling Cordoba to "hold off" doing further research. According to the plurality, it was "a stretch to believe that, as [Robertelli] recalls, Cordoba

---

[12] The DRB dismissed the RPC 5.1(b) and (c) and RPC 8.4(a) and (d) charges.

19

never used the words 'public' or 'private' to explain the change" in Hernandez's Facebook settings or that "the privacy component [was] so esoteric that an attorney cannot fathom what it means in the context of a nascent technology."

In short, in assessing credibility, the plurality rejected Robertelli's account and maintained that "[i]gnorance cannot be used as a shield."

2.

The two other members in favor of imposing discipline voted for a censure. In a dissenting opinion, they stated that "[Robertelli] failed to supervise his assistant when he knew, without question, that she was, at his instruction, trying to make contact with an adverse represented person." (emphasis added). They clearly did not find Robertelli credible in coming to their conclusion.

3.

Two DRB members, who voted to dismiss the disciplinary complaint, were unwilling to "second guess" the conclusions of the Special Master "who had the opportunity to observe the testimony and evaluate the credibility of the witnesses." Those two members gave great weight to three "undisputed" facts on which the Special Master rested his decision: Cordoba "did not explain to [Robertelli] the various privacy settings on Facebook or explain to him how

20

the settings on that account changed at some point from public to quasi-private"; Robertelli was "technologically unsophisticated," "never had a Facebook page," and primarily "communicated with his staff in person or by telephone"; and "Cordoba and [Robertelli] testified that [Robertelli] never directed Cordoba to contact Hernandez or send any kind of message to him." Those DRB members highlighted (1) "the conflicting testimony [and] the changed recollection of witnesses" over the course of the investigation, (2) "Hernandez's deletion of his Facebook page," and (3) "the flimsy, almost non-existent evidence that [Robertelli] had meaningful knowledge of the workings of an embryonic Facebook in 2008." In their view, the OAE failed to prove an RPC violation by clear and convincing evidence.

4.

Another DRB member who voted to dismiss the complaint took the position that Cordoba's communication to Hernandez "did not relate to the subject of the lawsuit" and, on that basis alone, concluded that Robertelli did not violate RPC 4.2. That member questioned whether the information on Hernandez's Facebook page -- shared with "600 other people with no confidential relationship to [him] or his counsel" -- was private. From that vantage point, the DRB member did not consider that a "potentially damaging video, placed in the public domain by a ['friend' of Hernandez], implicated an

21

attorney-client communication." He concluded that "the majority decision would allow RPC 4.2 and RPC 8.4(c) to function as a defensive weapon inhibiting the truth-seeking process."

### E.

Robertelli filed a petition for review challenging the DRB majority's finding that he violated the RPCs and the DRB plurality's decision to impose an admonition. The OAE filed a cross-petition challenging the DRB plurality's imposition of an admonition.[13] We elected to review this matter on our own motion and issued an order to show cause "why [Robertelli] should not be disbarred or otherwise disciplined." See R. 1:20-16(b) ("The Court may, on its own motion, decide to review any determination of the Board where disbarment has not been recommended.").

### II.

### A.

Robertelli urges this Court to accept the credibility findings made by the Special Master and to dismiss the disciplinary charges that have cast a cloud over his professional reputation for over a decade. He claims that the DRB, in addition to improvidently casting aside the Special Master's credibility

---

[13] The OAE also cross-petitioned for review of the DRB's dismissal of the RPC 8.4(d) charge.

22

findings, did not give sufficient weight to Facebook's recent emergence on the social media scene in 2008, to Robertelli's unfamiliarity with the nature of Facebook and its terminology, and to the lack of ethical guidance on the issue before us. What may seem obvious to many today, Robertelli implores, should not be imputed to his limited understanding of social media in 2008.

B.

The OAE asks this Court to follow the DRB's decision to impose discipline on Robertelli for violating RPCs 4.2, 5.3, and 8.4(c) -- and, despite the DRB's dismissal of the RPC 8.4(d) charge, to find that Robertelli engaged in conduct prejudicial to the administration of justice by attempting to gain a litigation advantage through the use of the improperly obtained wrestling video. The OAE chides Robertelli for his lack of remorse and for blaming Hernandez for accepting Cordoba's "friend" request. The OAE reasons that Hernandez had no duty to investigate the identity of Cordoba but that Robertelli had an ethical obligation to supervise his paralegal, regardless of the novelty of Facebook, and not to communicate with a represented party. The OAE recommends the imposition of a reprimand.

III.

The ethical charges filed against Robertelli have drawn varied responses from the disciplinary authorities: the District Ethics Committee declined to

23

docket the charges; the Special Master dismissed the charges after hearing three days of testimony; and the DRB issued four opinions, one in favor of imposing an admonition, another in favor of imposing a censure, and two in favor of dismissing the charges. As the final body to review this more-than-decade-long case, we start at a familiar place -- our standard of review.

In reviewing an attorney disciplinary determination de novo, as required by Rule 1:20-16(c), we must independently examine the record to determine whether an ethical violation is supported by clear and convincing evidence. In re Pena, 162 N.J. 15, 17 (1999). The DRB is governed by the same standard of review. See R. 1:20-15(e)(3).

The record in this case was developed during three days of testimony before a special master who heard from multiple witnesses, particularly those who played key roles in the events that led to the OAE's filing of charges against Robertelli. Similar to our de novo review of a judicial disciplinary proceeding, here we must give "due" though "not controlling" deference to the Special Master's conclusions based on his "assessment of the demeanor and credibility of witnesses." See In re Subryan, 187 N.J. 139, 145 (2006) (quoting In re Disciplinary Procedures of Phillips, 117 N.J. 567, 579-80 (1990)); see also In re Alcantara, 144 N.J. 257, 264 (1995) (agreeing with the District Ethics Committee's determination that witnesses were credible and

24

noting "[t]he [District Ethics Committee] observed the witnesses' demeanor"); In re Norton, 128 N.J. 520, 535 (1992) ("We agree generally with the [District Ethics Committee's] analysis of the events, which is based primarily on its assessment of the witnesses' credibility."). However, when the credibility findings are not fairly supported by the record, we owe no deference and may reject those findings. See Subryan, 187 N.J. at 145.

The plurality and dissenting DRB opinions acknowledged the deference owed to the credibility findings of the Special Master but differed on whether deference should be afforded to those findings in this case.

Although we are the final triers of fact in a disciplinary matter, a special master's credibility findings are generally entitled to some level of deference. That is so because, as an appellate court, we are left to survey the landscape of a cold record. We recognize that a special master has "the opportunity to make first-hand credibility judgments about the witnesses who appear[ed] on the stand," see DYFS v. E.P., 196 N.J. 88, 104 (2008), and "to assess their believability" based on human factors indiscernible in a transcript: the level of certainty or uncertainty expressed in a vocal response, the degree of eye contact, whether an answer to a question is strained or easily forthcoming, and so many other indicia available only by actual observation of the witness, see Jastram v. Kruse, 197 N.J. 216, 230 (2008).

25

At every point in this disciplinary process -- before the Special Master, the DRB, and this Court -- the OAE has had the burden of proving by clear and convincing evidence that Robertelli committed a violation of the RPCs charged in the complaint. See In re Helmer, 237 N.J. 70, 88 (2019); R. 1:20-6(c)(2)(B), (C). To satisfy the clear-and-convincing standard, the evidence must produce in our minds "a firm belief or conviction" that the charges are true. Helmer, 237 N.J. at 88 (quoting In re Seaman, 133 N.J. 67, 74 (1993)). In other words, the evidence must be "so clear, direct and weighty and convincing as to enable [us] to come to a clear conviction, without hesitancy, of the precise facts in issue." Id. at 88-89 (quoting Seaman, 133 N.J. at 74). The "high standard" of proof in an attorney disciplinary action reflects the "serious consequences" that follow from a finding that an attorney violated the RPCs. In re Sears, 71 N.J. 175, 197-98 (1976).

We now apply those precepts to the case before us.

IV.

A.

Our thorough review of the record, giving due though not controlling deference to the credibility findings of the Special Master, leads us to the conclusion that the OAE has not sustained its burden of proving by clear and convincing evidence that Robertelli violated the RPCs.

26

1.

Certain facts are basically undisputed.  Facebook is ubiquitous today, but it was not in 2008.  Then, Facebook had recently emerged from college campuses onto a world stage, transforming itself from a youth medium to a communication/information medium for people of all ages.  That swift transition explains the early generational divide in the understanding of that new social media platform.  In 2008, Cordoba had recently graduated from college, where she had a Facebook page; on the other hand, Robertelli, then forty-six years old, had installed a computer on his office desk just two years earlier.

Robertelli was not tech savvy.  He communicated mostly in person or by telephone.  He had, at best, a primitive understanding of social media that led him to believe that Facebook was just another extension of the internet.  Like many attorneys, he viewed the internet as akin to a public bulletin board or a public library, where information exposed to the world could be foraged, collected, and used to advance the interests of a client in litigation.  And indeed, even in the realm of social media, such as Facebook, jurisdictions appear to universally hold that "[a] lawyer may view the public portion of a person's social media profile or view public posts even if such person is represented by another lawyer."  N.Y. Bar Ass'n, Com. & Fed. Litig. Section,

27

Social Media Ethics Guidelines, No. 4.A (2019); see also, e.g., N.C. Formal

Ethics Op. 2018-5 (2019) ("Lawyers may view the public portion of a person's

social network presence."); Me. Ethics Op. 217 (2017) ("Merely accessing

public portions of social media does not constitute a 'communication' with a

represented party for the purposes of [the equivalent of RPC 4.2].").

At least, as of early 2008, Robertelli did not know how Facebook

functioned, did not know about its privacy settings, and did not know the

language of Facebook, such as "friending." No one disputed at the Special

Master hearing that Facebook was a novelty to the bar in 2008. As of 2008, no

jurisdiction had issued a reported ethics opinion giving guidance on the issue

before this Court -- whether sending a "friend" request to a represented client

without the consent of the client's attorney constitutes a communication on the

subject of the representation in violation of RPC 4.2. The absence of ethical

guidance at that time evidently reflected that Facebook had yet to become the

familiar social media platform that it is today in the legal community. Many

lawyers in 2008, like Robertelli, had a "[m]inimum" understanding of

Facebook.

Robertelli's paralegal had retained her Facebook page from college and

knew the language of that new social media platform. One of her job duties at

Rivkin Radler was to conduct internet research, such as background checks

28

surveying a person's criminal, educational, and employment history, as she did in the case of Hernandez. It was at that point, when Cordoba used her personal Facebook page to research Hernandez's background, that recollections clashed at the Special Master hearing about what occurred a decade earlier.

We now turn to the disputed facts.

2.

At the hearing, Cordoba testified that, at first, Hernandez's Facebook page was open to the public; Hernandez testified that his Facebook page was always private. Cordoba stated that she forwarded Hernandez the you-look-like-my-favorite-hockey-player message, and then Hernandez sent the "friend" request; Hernandez stated that Cordoba sent him the "friend" request, and then forwarded the message. Hernandez deleted his Facebook page before the filing of the grievance, destroying an objective means of determining who had the better memory.

According to Cordoba, when Hernandez's Facebook page turned private, she consulted with Robertelli and told him her only means of access was to send a "friend" request. But Cordoba conceded that even though she attempted to give a "simple" explanation of Facebook's privacy settings, she did not believe Robertelli understood the significance of a "friend" request. The Special Master reasoned that Robertelli instructed Cordoba to hold off

29

proceeding further until he checked with the insurance adjuster because Dawn Mulligan of the Joint Insurance Fund had to authorize payment for investigatory services. That makes sense. It is unlikely that Robertelli sought ethical advice from the insurance adjuster.

Robertelli testified that, in explaining to him the change in Hernandez's Facebook page, Cordoba told him that Hernandez's Facebook information was in a different area of the internet, on the equivalent of a bulletin board but accessible by the "click of a button." In Robertelli's account, Cordoba never used the term "friend." He told her to click the button and to continue to monitor the site.

The Special Master observed the witnesses firsthand. He found that the passage of time had dulled their memories. The refreshing of Cordoba's memory was not done with contemporaneous notes but with memos of Cordoba's interviews conducted years after her brief conversations with Robertelli. We reject the suggestion by the DRB plurality, based on its focus on an isolated line in the Special Master's forty-eight-page report, that the Special Master found Cordoba's testimony unreliable because she had laryngitis at the hearing. The Special Master did not find Cordoba purposefully untruthful but rather found her struggling with an uncertain memory. The Special Master observed Robertelli on the stand -- an attorney

who had a spotless "reputation for integrity and professionalism" -- and concluded that Robertelli "reasonably . . . believed" that Cordoba was searching for "publicly available information for material useful to his client."

We give due regard to the Special Master's credibility findings based on his careful observation of the witness testimony unfolding before his eyes. In the end, based on our independent review of the record, the evidence is not "so clear, direct and weighty and convincing as to enable [us] to come to a clear conviction, without hesitancy, of the precise facts in issue," and therefore the OAE has not met its burden of producing in our minds "a firm belief or conviction" that Robertelli violated RPCs 4.2; 5.3; or 8.4(c) or (d). See Helmer, 237 N.J. at 88-89 (quoting Seaman, 133 N.J. at 74).

We additionally note that the evidence fell far short of establishing that Robertelli "engage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation," RPC 8.4(c), or "engage[d] in conduct that is prejudicial to the administration of justice," RPC 8.4(d). When asserted as an independent basis for discipline, RPC 8.4(d) applies only "to particularly egregious conduct." Helmer, 237 N.J. at 83 (quoting In re Hinds, 90 N.J. 604, 632 (1982)). Although the better course might have been for Robertelli to accede that the information downloaded from Hernandez's Facebook page was inadmissible after he learned about the manner in which it was obtained, we

31

cannot fault him for litigating a matter that this Court stated "presents a novel ethical issue." See Robertelli, 224 N.J. at 487.

We find that the disciplinary charges against Robertelli have not been proven by clear and convincing evidence.

We now briefly review those charges and issue a few directives to remove all doubt, going forward, about a lawyer's professional obligations in the use of social media.

B.

RPC 4.2 provides that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows . . . to be represented by another lawyer in the matter . . . unless the lawyer has the consent of the other lawyer." The purpose of RPC 4.2 is to deter lawyer overreaching and unfair gamesmanship -- "protecting a represented party from being taken advantage of by adverse counsel." Michels, N.J. Attorney Ethics 802 (2021) (quoting Curley v. Cumberland Farms, Inc., 134 F.R.D. 77, 82 (D.N.J. 1991), aff'd, 27 F.3d 556 (3d Cir. 1994)); see also Model Rules of Pro. Conduct r. 4.2 cmt. 1 (Am. Bar Ass'n 1983).

Robertelli may have had a good faith misunderstanding about the nature of Facebook in 2008, as the Special Master found; but there should be no lack

32

of clarity today about the professional strictures guiding attorneys in the use of Facebook and other similar social media platforms.

When represented Facebook users fix their privacy settings to restrict information to "friends," lawyers cannot attempt to communicate with them to gain access to that information, without the consent of the user's counsel. To be sure, a lawyer litigating a case who -- by whatever means, including through a surrogate -- sends a "friend" request to a represented client does so for one purpose only: to secure information about the subject of the representation, certainly not to strike up a new friendship. Enticing or cajoling the represented client through a message that is intended to elicit a "friend" request that opens the door to the represented client's private Facebook page is no different. Both are prohibited forms of conduct under RPC 4.2. When the communication is ethically proscribed, it makes no difference in what medium the message is communicated. The same rule applies to communications in-person or by letter, email, or telephone, or through social media, such as Facebook.

That is the universal view adopted by jurisdictions that have addressed the issue. See, e.g., N.Y. Bar Ass'n, Com. & Fed. Litig. Section, No. 4.C ("A lawyer shall not contact a represented party or request access to review the non-public portion of a represented party's social media profile unless express

33

consent has been furnished by the represented party's counsel."); N.C. Formal Ethics Op. 2018-5 ("[R]equesting access to the restricted portions of a represented person's social network presence is prohibited [by the equivalent of RPC 4.2] unless the lawyer obtains consent from the person's lawyer."); Me. Ethics Op. 217 ("[A]n attorney may not directly or indirectly access or use private portions of a represented party's social media, because the efforts to access and use the private information . . . are prohibited 'communications' with a represented party . . . ."); D.C. Ethics Op. 371 (2016) ("[R]equesting access to information protected by privacy settings, such as making a 'friend' request to a represented person, does constitute a communication that is covered by the [equivalent of RPC 4.2]."); Or. Formal Ethics Op. 2013-189 (Rev. 2016) (stating that lawyers may not request access to the social media of a represented party without the consent of the party's counsel); Colo. Formal Ethics Op. 127 (2015) ("[A] lawyer may not request permission to view a restricted portion of a social media profile or website of a person the lawyer knows to be represented by another lawyer in that matter, without obtaining consent from that counsel."); W. Va. Ethics Op. 2015-02, at 10-11 (2015) ("[A]ttorneys may not contact a represented person through social media . . . nor may attorneys send a 'friend request' to represented persons.").

34

What attorneys know or reasonably should know about Facebook and other social media today is not a standard that we can impute to Robertelli in 2008 when Facebook was in its infancy. See In re Seelig, 180 N.J. 234, 257 (2004) ("When the totality of circumstances reveals that the attorney acted in good faith and the issue raised is novel, we should apply our ruling prospectively in the interests of fairness."). Although we find that Robertelli did not violate RPC 4.2 or the other RPCs cited in the complaint, given the novelty of Facebook in 2008 and for the reasons already stated, lawyers should now know where the ethical lines are drawn. Lawyers must educate themselves about commonly used forms of social media to avoid the scenario that arose in this case. The defense of ignorance will not be a safe haven.

We remind the bar that attorneys are responsible for the conduct of the non-lawyers in their employ or under their direct supervision. RPC 5.3 requires that every attorney "make reasonable efforts to ensure that the" conduct of those non-lawyers "is compatible with [the attorney's own] professional obligations" under the RPCs. RPC 5.3(a), (b). For example, an attorney will be held accountable for the conduct of a non-lawyer if the attorney "orders or ratifies the conduct" that would constitute an ethical violation if committed by the attorney or "knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable

35

remedial action."  RPC 5.3(c)(1), (2).  In short, attorneys must make reasonable efforts to ensure that their surrogates -- including investigators or paralegals -- do not communicate with a represented client, without the consent of the client's attorney, to gain access to a private Facebook page or private information on a similar social media platform.

V.

In sum, we hold that the disciplinary charges set forth in the complaint against Robertelli have not been proven by clear and convincing evidence and must be dismissed.  We refer to the Advisory Committee on Professional Ethics, for further consideration, the issues raised in this opinion.  After its review, the Committee shall advise this Court whether it recommends any additional social media guidelines or amendments to the RPCs consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in JUSTICE ALBIN's opinion.

36